**SQUITIERI & FEARON, LLP**
Olimpio Lee Squitieri (*pro hac vice* forthcoming)
205 Hudson Street, 7th Floor
New York, New York 10013
Telephone: 212-421-6492
lee@sfclasslaw.com

**MOORE LAW, PLLC**
Fletcher Moore (*pro hac vice* forthcoming)
30 Wall Street, 8th Floor
New York, New York 10005
Telephone: (212) 709-8245
fletcher@fmoorelaw.com

**THE DIULIO FIRM PC**
Kristopher P. Diulio (Bar No. 229399)
KDiulio@DiulioFirm.com
3330 Harbor Blvd., Suite 334
Costa Mesa, California 92626
Telephone: 714-450-6830

Attorneys for Plaintiff
FLOR ANGELA BANEGAS

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FLOR ANGELA VANEGAS, Derivatively on Behalf of NVIDIA CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>JEN-HSUN HUANG; TENCH COXE; JOHN O. DABIRI; DAWN HUDSON; HARVEY C. JONES; MELISSA B. LORA; STEPHEN C. NEAL; SUZANNE NORA JOHNSON; A. BROOKE SEAWELL; AARTI SHAH; MARK A. STEVENS; AJAY K. PURI; COLETTE M. KRESS; DEBORA SHOQUIST; DONALD F. ROBERTSON, JR.; and TIMOTHY S. TETER,<br><br>Defendants.<br><br>and,<br><br>NVIDIA CORPORATION,<br><br>Nominal Defendant. | CASE NO.<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:**<br><br>**1. VIOLATONS OF SECTION 14(a) OF THE EXCHANGE ACT**<br>**2. BREACH OF FIDUCIARY DUTY**<br>**3. BREACH OF FIDUCIARY DUTY**<br>**4. UNJUST ENRICHMENT**<br>**5. UNJUST ENRICHMENT**<br><br>**DEMAND FOR JURY TRIAL** |

1. Plaintiff FLOR ANGELA VANEGAS ("Plaintiff"), by undersigned counsel, brings this action derivatively on behalf of nominal defendant NVIDIA Corporation ("NVIDIA" or the "Company") against defendants Jen-Hsun Huang ("Huang"), Tench Coxe ("Coxe"), John O. Dabiri ("Dabiri"), Dawn Hudson ("Hudson"), Harvey C. Jones ("Jones"), Melissa B. Lora ("Lora"), Stephen C. Neal ("Neal"), Suzanne Nora Johnson ("Johnson"), A. Brooke Seawell ("Seawell"), Aarti Shah ("Shah"), And Mark A. Stevens ("Stevens"), Ajay K. Puri ("Puri"), Colette M. Kress ("Kress"), Debora Shoquist ("Shoquist"), Donald F. Robertson, Jr. ("Robertson"), and Timothy S. Teter ("Teter"). Plaintiff alleges the following on personal knowledge as to Plaintiff and Plaintiff's own acts, and on information and belief as to all other matters. Plaintiff's belief rests on counsel's investigation, which included, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding NVIDIA, analysts' reports and advisories about the Company, and other information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

2. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from October 9, 2025 and November 8, 2026 ("Relevant Period") inclusive.

3. NVIDIA makes the advanced graphics processing units ("GPUs") that power modern artificial intelligence. The U.S. government treats those chips as national-security assets and forbids their export to China. Compliance with those export controls, and protection of the Company's technology from foreign intelligence services, are mission-critical to NVIDIA. A lapse threatens its government relationships, its license to sell abroad, its reputation and consequently the value of the company.

4. Despite that, for more than a year NVIDIA's Board let the Company's founder and Chief Executive Officer, defendant Jen-Hsun ("Jensen") Huang, keep a romantic relationship with a

senior executive of an NVIDIA customer that was under federal investigation for diverting NVIDIA chips to China in violation of federal law. The executive, Huang Le, also known as Alice Huang ("Ms. Huang"), worked for Megaspeed, a Singapore-based data center operator. Megaspeed was positioned to buy roughly $2 billion of NVIDIA technology. The U.S. Department of Commerce had been investigating Megaspeed since late 2024. U.S. intelligence agencies later concluded that Ms. Huang was a Chinese intelligence asset passing information to Beijing.

5. The warning signs were public and specific. In October 2025, The New York Times reported that Commerce was investigating Megaspeed and that Singapore police were also investigating it. The Times also reported that Ms. Huang had socialized with Mr. Huang. NVIDIA issued a public statement also in October 2025 assuring investors that its compliance team had vetted Megaspeed, that the Company had "engaged with the U.S. government," and that NVIDIA's visits to Megaspeed's facilities had found no "diversion." The Board took no visible step to examine the CEO's own ties to the customer under scrutiny.

6. A year later, on October 29, 2026, the Times reported that U.S. intelligence had identified Ms. Huang as a Chinese asset and that surveillance had revealed her close relationship with Mr. Huang. Again, NVIDIA did not disclose an investigation or consideration to undertake one. Its spokesman called Mr. Huang's interactions with Ms. Huang ordinary customer contact. The next day, Mr. Huang personally told Bloomberg that NVIDIA's dealings with Megaspeed were normal and not unusual. Three House committee chairs then demanded a closed-door briefing on Mr. Huang's contacts with Ms. Huang and on NVIDIA's safeguards against foreign espionage.

7. On Sunday, November 8, 2026, the truth came out. Mr. Huang admitted to the Board that he had been intimate with Ms. Huang. Only then did the Board announce an "independent investigation." Even as it did so, the Board publicly said it had "no reason to believe" that national security or NVIDIA's secrets had been compromised, before any investigation had taken place. It left Mr. Huang in charge of the Company while he is investigated.

8. On the next trading day, November 9, 2026, NVIDIA's stock fell $7.97 per share, or about 4.3%, erasing roughly $190 billion in market value. The President of the United States said the same day that the FBI was investigating the matter. A securities class action naming NVIDIA and

Mr. Huang was filed that day. It alleges that the Company's statements about Megaspeed and about Mr. Huang's interactions with Ms. Huang misled investors.

9. As press reports now describe it, the board has long deferred to Mr. Huang. Four of the ten outside directors have sat beside him for roughly three decades, and the Board has let him resist adopting a CEO succession plan. Mr. Huang breached his duty of loyalty by concealing a conflict that put the Company at risk and by making and allowing misleading public statements. The other directors breached their duty of oversight by consciously ignoring red flags about the CEO, a customer under export-control investigation, and a foreign intelligence threat that was intent on infiltrating NVIDIA to allow espionage for China. Plaintiff seeks to recover NVIDIA's losses and to impose governance reforms to protect the company, its shareholders, and ensure compliance with federal laws and the Company's internal code, controls, protocols and procedures.

10. Demand on the Board is futile. Mr. Huang is the subject of the misconduct and the Board has failed to report any of his misconduct until compelled to do so by the media and government authorities. A majority of the other directors face a substantial likelihood of liability for their oversight failures and failure to maintain internal controls. Several directors also lack independence from Mr. Huang because of decades-long financial and professional ties, or because a family member's employment depends on management he controls.

11. Moreover, certain Director Defendants Stevens, Neal, Dabiri, Shah, Jones, Seawell and Huang breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock price was artificially inflated as a result of the Individual Defendants' false and misleading statements discussed herein, netting combined total proceeds of approximately $2,000,000,000. Thus, a majority of the current sitting directors sold NVIDIA stock while in possession of material non public information.

## **II. JURISDICTION**

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs claims raise a federal question under Section 14( a) of the Exchange Act, 15 U.S.C. § 78n(a)(l) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9. Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of

the Exchange Act.

13. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

15. The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation or limited liability company doing business in California, or he or she is an individual who has minimum contacts with California to justify the exercise of jurisdiction over them.

16. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

17. Venue is proper in this District because NVIDIA and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## III. PARTIES

### A. Plaintiff

18. Plaintiff FLOR VANEGAS is a stockholder of NVIDIA. Plaintiff has continuously held NVIDIA common stock at all relevant times and will continue to hold it through the end of this litigation.

### B. Nominal Defendant

19. Nominal defendant NVIDIA is a Delaware corporation headquartered at 2788 San Tomas Expressway, Santa Clara, California 95051. Its common stock trades on the Nasdaq Global Select Market under the symbol "NVDA." NVIDIA designs GPUs and related systems used in AI data centers worldwide. Its most advanced products are subject to U.S. export restrictions that bar their sale into China.

### C. Individual Defendants

20. Jen-Hsun Huang co-founded NVIDIA in 1993 and has served as its President, Chief

Executive Officer, and a director ever since. He is the Company's largest individual stockholder. As of March 23, 2026, he beneficially owned 870,604,104 shares, about 3.58% of the outstanding stock. His NVIDIA stock holding is valued at roughly $138 billion to $148 billion. NVIDIA paid him $36,343,830 in total compensation for fiscal 2026. Two of his children are NVIDIA employees, and each received more than $1.2 million in fiscal 2026 compensation. Mr. Huang is not an independent director. He is sued as a director and as an officer. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Huang made the following sales of Company common stock:

| Trade Date | Form 4 Filed | Shares Sold | Wtd. Avg. Price | Value of Sale | Shares Owned After | Holdings Sold |
|---|---|---|---|---|---|---|
| 10/8/2025* | 10/10/2025 | 225,000 | $190.60 | $42,885,101 | 852,808,603 | 0% |
| 10/13/2025* | 10/15/2025 | 225,000 | $183.73 | $41,338,563 | 852,583,603 | 0% |
| 10/16/2025* | 10/20/2025 | 225,000 | $182.48 | $41,058,402 | 852,358,603 | 0% |
| 10/21/2025* | 10/23/2025 | 225,000 | $181.04 | $40,734,400 | 852,133,603 | 0% |
| 10/24/2025* | 10/28/2025 | 125,000 | $188.47 | $23,558,262 | 852,008,603 | 0% |
| 10/29/2025 | 10/31/2025 | 25,000 | $207.91 | $5,197,790 | 851,983,603 | 0% |
| **Total** | | **1,050,000** | | **$194,772,518** | | |

21. Tench Coxe has been a NVIDIA director since 1993 and sits on the Audit Committee and Compensation Committee. As an investor at Sutter Hill Ventures, he co-led NVIDIA's 1993 seed round alongside Sequoia Capital. As of March 23, 2026, he beneficially owned 30,555,240 shares.

22. John O. Dabiri has been a NVIDIA director since 2020 and sits on the Compensation Committee and the Nominating and Corporate Governance Committee ("NCGC"). He is a professor of aeronautics and mechanical engineering at the California Institute of Technology. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Dabiri made the following sales:

| Trade Date | Form 4 Filed | Shares Sold | Wtd. Avg. Price | Value of Sale | Shares Owned After | Holdings Sold |
|---|---|---|---|---|---|---|
| 11/24/2025 | 11/26/2025 | 626 | $179.42 | $112,317 | 17,792 | 3% |
| 3/13/2026 | 3/17/2026 | 3,004 | $184.90 | $555,440 | 14,788 | 17% |
| 5/27/2026 | 5/29/2026 | 625 | $214.00 | $133,750 | 14,163 | 4% |
| **Total** | | **4,255** | | **$801,507** | | |

23. Dawn Hudson has been a NVIDIA director since 2013 and chairs the Compensation Committee. She is a former chief marketing officer of the National Football League.

24. Harvey C. Jones has been a NVIDIA director since 1993 and sits on the Audit Committee and NCGC. He is a former chief executive officer of Synopsys, Inc. As of March 23, 2026, he beneficially owned 7,003,687 shares.

25. Melissa B. Lora has been a NVIDIA director since 2023 and sits on the Audit Committee and NCGC. She is a former president of Taco Bell International.

26. Stephen C. Neal has been a NVIDIA director since 2019. He is the Board's Lead Director, and he chairs the NCGC. He is Chairman Emeritus and Senior Counsel of Cooley LLP. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Neal made the following sales:

| Trade Date | Form 4 Filed | Shares Sold | Wtd. Avg. Price | Value of Sale | Shares Owned After | Holdings Sold |
|---|---|---|---|---|---|---|
| 6/3/2026 | 6/5/2026 | 15,500 | $215.73 | $3,343,863 | 169,367 | 8% |
| **Total** | | **15,500** | | **$3,343,863** | | |

27. Suzanne Nora Johnson has been a NVIDIA director since July 13, 2026, and sits on the Audit Committee. She is a former vice chairman of The Goldman Sachs Group, Inc.

28. A. Brooke Seawell has been a NVIDIA director since 1997 and chairs the Audit Committee. He is a former chief financial officer of Synopsys, Inc. As of March 23, 2026, he beneficially owned 2,506,607 shares. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Seawell made the following sales:

| Trade Date | Form 4 Filed | Shares Sold | Wtd. Avg. Price | Value of Sale | Shares Owned After | Holdings Sold |
|---|---|---|---|---|---|---|
| 12/2/2025 | 12/4/2025 | 12,728 | $183.93 | $2,341,117 | 2,507,137 | 1% |
| **Total** | | **12,728** | | **$2,341,117** | | |

29. Aarti Shah has been a director since 2020 and sits on the Audit Committee and Compensation Committee. She is a former chief information and digital officer of Eli Lilly and Company. Her son is employed by NVIDIA. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Shah made the following sales:

| Trade Date | Form 4 Filed | Shares Sold | Wtd. Avg. Price | Value of Sale | Shares Owned After | Holdings Sold |
|---|---|---|---|---|---|---|
| 3/19/2026 | 3/20/2026 | 19,000 | $176.71 | $3,357,549 | 36,007 | 35% |
| **Total** | | **19,000** | | **$3,357,549** | | |

30. Mark A. Stevens has been a NVIDIA director since 2008, and earlier served from 1993 to 2006. He sits on the Compensation Committee and NCGC. As a Sequoia Capital partner, he co-led NVIDIA's 1993 seed round. As of March 23, 2026, he beneficially owned 34,069,572 shares. In 2026 he sold more than six million NVIDIA shares for about $1.39 billion. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Huang made the following sales:

| Trade Date | Form 4 Filed | Shares Sold | Wtd. Avg. Price | Value of Sale | Shares Owned After | Holdings Sold |
|---|---|---|---|---|---|---|
| 12/5/2025 | 12/9/2025 | 350,000 | $181.73 | $63,604,065 | 34,663,754 | 1% |
| 12/19/2025 | 12/22/2025 | 222,500 | $180.17 | $40,087,380 | 34,182,604 | 1% |
| 3/20/2026 | 3/24/2026 | 221,682 | $173.68 | $38,502,524 | 33,960,922 | 1% |
| 6/2/2026* | 6/4/2026 | 1,000,000 | $221.10 | $221,102,600 | 32,653,422 | 3% |
| 6/18/2026 | 6/23/2026 | 885,000 | $210.17 | $185,999,938 | 31,768,422 | 3% |
| 8/31/2026* | 9/2/2026 | 1,848,501 | $222.26 | $410,843,671 | 29,921,132 | 6% |
| 9/3/2026* | 9/8/2026 | 1,022,239 | $230.51 | $235,636,867 | 28,898,893 | 3% |
| 9/18/2026 | 9/22/2026 | 1,366,000 | $219.73 | $300,147,095 | 27,532,893 | 5% |
| **Total** | | **6,915,922** | | **$1,495,924,140** | | |

31. Ajay K. Puri served as NVIDIA senior sales executive for more than two decades: Senior Vice President, Worldwide Sales from 2005 to 2009, and Executive Vice President, Worldwide Field Operations from 2009 until his retirement effective August 24, 2026. He was a named executive officer (NEO) and Section 16 officer reporting to CEO Jen-Hsun Huang. He remains with NVIDIA in a senior advisory role. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Puri made the following sales:

| Trade Date | Form 4 Filed | Shares Sold | Wtd. Avg. Price | Value of Sale | Shares Owned After | Holdings Sold |
|---|---|---|---|---|---|---|
| 1/7/2026 | 1/9/2026 | 200,000 | $187.82 | $37,563,619 | 4,421,139 | 4% |
| 1/21/2026 | 1/23/2026 | 200,000 | $180.04 | $36,007,160 | 4,221,139 | 5% |
| 3/10/2026 | 3/11/2026 | 300,000 | $182.52 | $54,756,044 | 4,071,684 | 7% |
| 3/18/2026 | 3/20/2026 | 300,000 | $182.25 | $54,676,140 | 3,702,155 | 7% |
| **Total** | | **1,000,000** | | **$183,002,963** | | |

32. Colette M. Kress has been NVIDIA's Executive Vice President and Chief Financial Officer since September 2013, making her one of the longest-tenured CFOs among mega-cap U.S.

issuers. She signs NVIDIA's periodic reports and 8-Ks, delivers the CFO commentary on quarterly earnings call, and is a named executive officer in the proxy. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Kress made the following sales:

| Trade Date | Form 4 Filed | Shares Sold | Wtd. Avg. Price | Value of Sale | Shares Owned After | Holdings Sold |
|---|---|---|---|---|---|---|
| 10/21/2025 | 10/23/2025 | 47,640 | $181.42 | $8,642,640 | 5,227,108 | 1% |
| 11/3/2025 | 11/5/2025 | 47,640 | $208.33 | $9,924,869 | 5,179,468 | 1% |
| 12/12/2025 | 12/12/2025 | 50,500 | $178.12 | $8,994,793 | 5,085,864 | 1% |
| 1/13/2026 | 1/15/2026 | 47,640 | $184.92 | $8,809,582 | 4,925,042 | 1% |
| 2/4/2026 | 2/6/2026 | 47,640 | $175.72 | $8,371,233 | 4,877,402 | 1% |
| 3/20/2026 | 3/20/2026 | 62,650 | $174.89 | $10,956,706 | 4,892,017 | 1% |
| 9/17/2026 | 9/18/2026 | 34,918 | $219.05 | $7,648,632 | 4,775,733 | 1% |
| **Total** | | **338,628** | | **$63,348,455** | | |

33. Debora Shoquist has been NVIDIA's Executive Vice President, Operations since 2009, running the company's supply chain, foundry relationships and manufacturing. She is a Section 16 reporting officer and one of NVIDIA's five named executive officers (NEOs). During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Shoquist made the following sales:

| Trade Date | Form 4 Filed | Shares Sold | Wtd. Avg. Price | Value of Sale | Shares Owned After | Holdings Sold |
|---|---|---|---|---|---|---|
| 10/21/2025 | 10/23/2025 | 47,640 | $181.42 | $8,642,640 | 5,227,108 | 1% |
| 11/3/2025 | 11/5/2025 | 47,640 | $208.33 | $9,924,869 | 5,179,468 | 1% |
| 12/12/2025 | 12/12/2025 | 50,500 | $178.12 | $8,994,793 | 5,085,864 | 1% |
| 1/13/2026 | 1/15/2026 | 47,640 | $184.92 | $8,809,582 | 4,925,042 | 1% |
| 2/4/2026 | 2/6/2026 | 47,640 | $175.72 | $8,371,233 | 4,877,402 | 1% |
| 3/20/2026 | 3/20/2026 | 62,650 | $174.89 | $10,956,706 | 4,892,017 | 1% |
| 9/17/2026 | 9/18/2026 | 34,918 | $219.05 | $7,648,632 | 4,775,733 | 1% |
| **Total** | | **338,628** | | **$63,348,455** | | |

34. Donald F. Robertson, Jr. served as NVIDIA's Vice President and Chief Accounting Officer from June 17, 2019 until May 4, 2026. On April 24, 2026, Robertson told the Company that he would retire as CAO effective May 4, 2026. He then stayed on as Vice President, Finance through July 1, 2026. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Robertson made the following sales:

| Trade Date | Form 4 Filed | Shares Sold | Wtd. Avg. Price | Value of Sale | Shares Owned After | Holdings Sold |
|---|---|---|---|---|---|---|
| 12/19/2025 | 12/22/2025 | 24,590 | $179.98 | $4,425,727 | 426,860 | 5% |
| 1/2/2026 | 1/6/2026 | 80,000 | $189.85 | $15,187,742 | 346,860 | 19% |

| Trade Date | Form 4 Filed | Shares Sold | Wtd. Avg. Price | Value of Sale | Shares Owned After | Holdings Sold |
|---|---|---|---|---|---|---|
| 3/20/2026 | 3/20/2026 | 5,396 | $174.75 | $942,944 | 337,120 | 2% |
| **Total** | | **109,986** | | **$20,556,413** | | |

35. Timothy S. Teter has been NVIDIA Corporation's chief legal officer since January 23, 2017, and has served as Executive Vice President, General Counsel and Secretary since February 2018. He is a named executive officer (NEO) in NVIDIA's proxy statements and a Section 16 reporting insider. As Secretary, he signs the Notice of Annual Meeting for each proxy statement, including the 2026 proxy filed May 12, 2026. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Shoquist made the following sales:

| Trade Date | Form 4 Filed | Shares Sold | Wtd. Avg. Price | Value of Sale | Shares Owned After | Holdings Sold |
|---|---|---|---|---|---|---|
| 8/31/2026 | 9/2/2026 | 30,000 | $217.88 | $6,536,515 | 3,022,096 | 1% |
| 9/21/2026 | 9/23/2026 | 30,460 | $222.80 | $6,786,533 | 2,955,898 | 1% |
| **Total** | | **60,460** | | **$13,323,048** | | |

36. Defendants Coxe, Dabiri, Hudson, Jones, Lora, Neal, Nora Johnson, Seawell, Shah, and Stevens are the "Outside Director Defendants." Together with Mr. Huang, they are the "Director Defendants" or "Individual Defendants." The eleven Director Defendants are the entire current Board:

| Director | Director since | Committees (★ = chair) | Shares owned (Mar. 23, 2026) |
|---|---|---|---|
| Jen-Hsun Huang | 1993 | — (CEO) | 870,604,104 |
| Tench Coxe | 1993 | Audit; Compensation | 30,555,240 |
| Harvey C. Jones | 1993 | Audit; NCGC | 7,003,687 |
| Mark A. Stevens | 2008 (also 1993–2006) | Compensation; NCGC | 34,069,572 |
| A. Brooke Seawell | 1997 | Audit ★ | 2,506,607 |
| Dawn Hudson | 2013 | Compensation ★ | 368,887 |
| Stephen C. Neal | 2019 | NCGC ★; Lead Director | 184,867 |
| John O. Dabiri | 2020 | Compensation; NCGC | 14,788 |
| Aarti Shah | 2020 | Audit; Compensation | 25,620 |
| Melissa B. Lora | 2023 | Audit; NCGC | 1,799 |
| Suzanne Nora Johnson | July 2026 | Audit | |

## IV. THE DEFENDANTS' FIDUCIARY DUTIES

37. As directors, and in Mr. Huang's case also as an officer, each Individual Defendant owes NVIDIA and its stockholders fiduciary duties of loyalty, care, and good faith. Those duties require each of them to put the Company's interests ahead of their own, to avoid undisclosed

conflicts, and to act honestly in public communications about the Company.

38. The duty of loyalty includes a duty of oversight. Directors must make a good-faith effort to put a reasonable board-level system of monitoring and reporting in place, and must respond to red flags once they learn of them. The duty applies with special force to compliance risks that are "mission critical" to the business. Corporate officers owe a similar oversight duty within their areas of responsibility, including a duty not to engage in, or allow, red-flag misconduct themselves.

39. NVIDIA's own governing documents assign these responsibilities to specific bodies of the Board:

a. The NCGC oversees the Company's policies and practices on governmental relations, trade compliance, and non-financial regulatory matters. It is also charged with reviewing and approving related-party transactions involving directors and executive officers and with screening them for conflicts. Defendants Neal (chair), Dabiri, Jones, Lora, and Stevens sit on the NCGC.

b. The Audit Committee oversees risks related to financial reporting and exposures, internal audit, and regulatory matters. Defendants Seawell (chair), Coxe, Jones, Lora, Nora Johnson, and Shah sit on the Audit Committee.

c. The Compensation Committee sets and evaluates the CEO's pay and administers the Company's compensation recovery (clawback) policy. Defendants Hudson (chair), Coxe, Dabiri, Shah, and Stevens sit on it.

d. The full Board, which has no chair and is led by Lead Director Neal, has stated that it plans to focus on geopolitical and regulatory risk and cybersecurity.

40. NVIDIA's Code of Conduct requires employees, officers, and directors to avoid activities that conflict, or appear to conflict, with the Company's interests. A CEO's undisclosed intimate relationship with an executive of a significant customer is such a conflict. That is especially true when the customer is under government investigation for diverting the Company's products.

41. NVIDIA's Code of Conduct states in part:

> **We do not trade on or disclose non-public information.**
>
> - We don't trade stock or other securities of NVIDIA while we are aware of material, non-public information or, if applicable, outside of designated trading periods (unless under a 10b5-1 trading plan).
> - We don't trade stock or other securities of other companies while we are aware of non-public information about them, including information that we learn through our work with NVIDIA.
> - We don't discuss material, non-public information about NVIDIA with anyone inside or outside the company without a valid need to know.
> - We don't make recommendations to anyone regarding the buying, selling, or holding of NVIDIA stock.

42. The Insider Trading Policy, effective September 22, 2021 and last updated February 20, 2025, states in part:

> **PRECLEARANCE**
>
> Section 16 directors and officers must obtain from Corporate Legal preclearance of any transaction in NVIDIA's stock.
>
> **COMPLIANCE | VIOLATIONS and CONSEQUENCES**
>
> The consequences of violating insider trading laws are severe and could include fines and imprisonment. Additionally, a violation of this Policy may result in discipline, up to and including termination of employment or engagement with NVIDIA.

43. The Individual Defendants also owed a duty not to knowingly disseminate, or allow the Company to disseminate, false or misleading information to stockholders.

## V. SUBSTANTIVE ALLEGATIONS

### A. Export-Control Compliance Is Mission Critical to NVIDIA

44. NVIDIA's growth depends on data center GPUs sold to cloud providers, AI developers, and governments around the world. The U.S. government regards NVIDIA's most

advanced chips as strategic assets. It has imposed successive export restrictions that bar their sale to China and limit sales to other jurisdictions.

45. NVIDIA's annual reports repeatedly identify U.S. export controls, and the U.S.–China relationship more broadly, as material risks to its business. NVIDIA's ability to sell into restricted markets depends on government licenses and on Washington's confidence in the Company. That dependence became concrete in December 2025, when the President announced that the U.S. government would receive 25% of revenue from approved sales of NVIDIA's H200 chips to China.

46. Two related risks therefore sit at the core of NVIDIA's business. The first is diversion: NVIDIA's chips reaching China through intermediaries in violation of U.S. law. The second is espionage: foreign intelligence services seeking access to NVIDIA's technology, plans, and leadership. Each risk is mission critical. Each requires board-level monitoring.

**B. Megaspeed, Ms. Huang, and Early Warning Signs**

47. Megaspeed is a data center and cloud computing company based in Singapore. By late 2025, it was reportedly positioned to buy about $2 billion of NVIDIA AI technology over a single year. That volume was unusually large for a little-known company.

48. Megaspeed acted in effect as a middleman. According to published reports, it bought NVIDIA chips from the U.S. arm of Inspur, a Chinese server maker whose parent the U.S. government has blacklisted for supplying technology to China's military. Megaspeed then sold the resulting computing capacity to Alibaba and other Chinese companies.

49. The U.S. Department of Commerce has investigated Megaspeed since late 2024. That year, a Commerce official visited Megaspeed's data center in Malaysia. The official found NVIDIA equipment still packed in its boxes, suggesting the equipment was being moved through the site rather than installed there. Singapore police opened their own investigation of Megaspeed for violating local law. In 2025, Singaporean authorities brought Ms. Huang in for questioning and then released her.

50. Ms. Huang's personal influence over Mr. Huang has been ongoing since at least mid-2024. In June 2024, she sat beside him at a gathering of NVIDIA customers at a bar in Taipei. A

tech executive present later recounted that she told the group she could get Mr. Huang to join them, and he promptly arrived, accompanied by two other NVIDIA executives. Photographs of the gathering were posted publicly on LinkedIn. Video later released by Taiwanese media shows the two together at a business dinner in May 2025. According to published reports, Ms. Huang used images of herself with Mr. Huang to promote her ties to him.

51. NVIDIA knew of the government's interest in Megaspeed by at least 2025. By its own account, it had "engaged with the U.S. government" about Megaspeed before October 2025, and its compliance team had examined Megaspeed's ownership.

**C. The October 2025 Report and NVIDIA's Response**

52. On October 9, 2025, The New York Times published an article titled "A Mystery C.E.O. and Billions in Sales: Is China Buying Banned NVIDIA Chips?" It reported that Commerce officials were actively investigating whether Megaspeed was helping Chinese companies evade U.S. export restrictions. It reported that Singapore police were also investigating Megaspeed. The article observed that the inquiry raised questions about how closely NVIDIA tracks where its chips end up. It also described Ms. Huang's social contact with Mr. Huang at the June 2024 Taipei gathering.

53. NVIDIA responded through its spokesman, John Rizzo. He said there was no evidence that NVIDIA's chips had been smuggled into China. He said NVIDIA had engaged with the U.S. government about Megaspeed. He said NVIDIA's compliance team had determined that Megaspeed was owned and operated by a company headquartered outside China with no Chinese shareholders. He said NVIDIA personnel had visited Megaspeed's facilities several times, most recently that week, and had "found no evidence of diversion."

54. Asked about Mr. Huang's appearance with Ms. Huang, the spokesman described it as a routine customer event. He said NVIDIA's field teams often host customers at conferences and that Mr. Huang sometimes stops by to give market updates.

55. Those statements presented Mr. Huang's contact with Ms. Huang as ordinary business. On information and belief, by the time they were made, Mr. Huang had developed a personal relationship with Ms. Huang that went well beyond customer contact. Mr. Huang knew this. The Company's statements did not disclose it.

56. The October 2025 report was a red flag for every member of the Board. It advised that (a) a large NVIDIA customer was under active U.S. and foreign investigation for diverting NVIDIA chips to China; (b) a senior executive of that customer had personal access to NVIDIA's CEO; and (c) the Company had publicly staked its credibility on export compliance and on the ordinary character of the CEO's contacts.

57. The Board did nothing in response that was disclosed to stockholders. On information and belief, it did not ask Mr. Huang about the nature of his relationship with Ms. Huang. It did not commission any review of the CEO's contacts with Megaspeed. It did not restrict his dealings with the customer, and it did not require any disclosure under the Code of Conduct or the related-party policy.

**D. U.S. Intelligence Identifies Ms. Huang as a Chinese Asset**

58. During roughly the same period in 2025, U.S. intelligence agencies concluded that Ms. Huang was a Chinese intelligence asset funneling information to Beijing. Surveillance of Ms. Huang showed that she was in contact with a U.S. person. That person was later identified as Mr. Huang. According to published reports, the surveillance revealed that the two had a close relationship. U.S. officials worried that Ms. Huang could glean sensitive information about NVIDIA and about U.S. chip policy through Mr. Huang.

**E. May 12, 2026 Proxy Statement**

59. On May 12, 2026, the Company filed the 2026 Proxy Statement with the SEC. Defendants Huang, Coxe, Dabiri, Hudson, Jones, Lora, Neal, Seawell, Shah, and Steven solicited the 2026 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

60. The 2026 Proxy Statement called for Company shareholders to vote on, inter alia: re-electing Defendants Huang, Coxe, Dabiri, Hudson, Jones, Lora, Neal, Seawell, Shah, and Steven to the Board.

61. With respect to the Company's Code of Conduct, the 2026 Proxy Statement stated:

> Our directors, executives, and employees are expected to conduct themselves with the highest degree of integrity, ethics, and honesty. Our credibility and reputation depend

> upon their good judgment, ethical standards, and personal integrity. Our Code of Conduct applies to all executive officers, directors, and employees, including our principal executive officer, principal financial officer, and principal accounting officer. The Financial Team Code of Conduct applies to our executive officers, directors, members of our finance department, and all employees involved in the preparation and review of externally-reported periodic financial reports, filings, and documents. We regularly review our Code of Conduct and related policies to ensure that they provide clear guidance to our directors, executives, and employees. We also regularly train our employees on our Code of Conduct and other policies.
>
> The Code of Conduct and the Financial Team Code of Conduct may be viewed in the Investor Relations section of our website at www.nvidia.com. If we make any amendments to either code, or grant any waiver from a provision of either code to any executive officer or director, we will promptly disclose the nature of the amendment or waiver on our website or in a report on Form 8-K. Information contained on our website is not incorporated by reference into this or any other report we file with the SEC.

62. With respect to the Company's Insider Trading Policy the 2026 Proxy Statement stated:

> Our Insider Trading Policy governs transactions in our securities and applies to the Board and our employees, contractors, and consultants. We believe our Insider Trading Policy is reasonably designed to promote compliance with insider trading laws, rules and regulations applicable to NVIDIA. Section 16 directors and officers must obtain preclearance before trading in NVIDIA's stock. In addition, we comply with applicable laws and regulations relating to insider trading with respect to transactions in our securities such as open market repurchases of our common stock from time to time.
>
> Under our Insider Trading Policy, hedging ownership of NVIDIA stock, including but not limited to trading in options, puts, calls, or other derivative instruments related to NVIDIA stock or debt, is not permitted. Additional prohibitions include purchasing NVIDIA stock on margin or holding NVIDIA stock in a margin account, or pledging NVIDIA stock as collateral for a loan. We allow participation in certain exchange funds for portfolio diversification.

63. Regarding the "Board of Directors' Role in Risk Oversight," the 2026 Proxy Statement stated the following:

> The Board reviews risks, oversees risk management, and delegates oversight of appropriate topics to its committees to support the Company's long-term objectives. The oversight responsibility of our Board and its committees is enabled by management reporting processes, including our ERM process, that are designed to provide visibility to our Board about the identification, assessment, and management of critical risks and management's risk mitigation strategies.
>
> Our Board retains direct oversight of strategic risks to NVIDIA and other risk areas not delegated to its committees. Delegation to Board committees enhances risk oversight by allocating authority and responsibility to the committee best suited to oversee specific risks, as outlined in their charters, with escalation to the full Board when appropriate. Committee chairpersons regularly report to the full Board on reviewed matters, including key risks, and collaborate with the Board to ensure effective risk management oversight. The Board believes its leadership structure facilitates robust risk oversight, with the independent Lead Director and independent committees proactively engaging with management. For further details, see Board

> Leadership Structure above.
>
> The Board retains full oversight of information security matters, including cybersecurity. The AC reviews the adequacy and effectiveness of the Company's information security policies, practices, and internal controls. The AC receives regular updates on information security from management, including the Chief Security Officer and security team, while the Board receives annual reports on these matters. The AC also meets in executive session with leaders of key control functions, ensuring direct access to management teams and appropriate staffing and resources.
>
> The Company's ERM process is an annual assessment of its risk environment, integrating risk evaluation with the Company's operations and strategies. This process examines internal and external factors, risk amplifiers, and emerging trends to prioritize mitigation efforts based on the risk horizon. It evaluates the potential impact and likelihood of risks materializing over relevant timeframes, considers future threats and trends, and identifies the actions, strategies, processes, controls, and procedures in place or to be implemented to manage and mitigate these risks.
>
> While the Company does not have a Chief Compliance Officer, the ERM process and action plan are reviewed by the CEO, other NEOs reporting directly to the CEO, and senior management members. These leaders are responsible for managing and monitoring key risks within their respective functional areas. The Company's internal audit team administers the ERM program on behalf of management.
>
> The ERM process is designed to align the Board's risk oversight with the Company's disclosure controls and procedures. Management involved in the ERM process prepares reports that are reviewed by the Board or its committees to ensure that disclosure controls and procedures function effectively.

64. Regarding the "Corporate Governance Policies" the 2026 Proxy Statement stated the following:

> The Board has adopted Corporate Governance Policies to ensure that the Board has the necessary authority and processes in place to review and evaluate our business operations as needed and to make decisions that are independent of our management. These policies include practices the Board follows with respect to its composition and selection, regular evaluations of the Board and its committees, Board meetings and involvement of senior management, senior management development, and Board committees and compensation. These policies may be viewed in the Investor Relations section of our website at www.nvidia.com.

65. Defendants Huang, Coxe, Dabiri, Hudson, Jones, Lora, Neal, Seawell, Shah, and Steven caused the 2026 Proxy Statement to be false and misleading by failing to disclose, inter alia, that China may have been buying the banned NVIDIA chip, China drove a significant portion of 2026 compute revenues, that Commerce officials were actively investigating whether Megaspeed was helping Chinese companies evade U.S. export restrictions, that Mr. Huang was involved in a romantic or personal relationship with Ms. Huang. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or

lacked a reasonable basis at all relevant times.

66. The 2026 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct and the Audit Committee Charter were not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2026 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

67. As a result of Defendants Huang, Coxe, Dabiri, Hudson, Jones, Lora, Neal, Seawell, Shah, and Steven causing the 2026 Proxy Statement to be false and misleading, Company shareholders voted, inter alia, to re-elect Defendants Huang, Coxe, Dabiri, Hudson, Jones, Lora, Neal, Seawell, Shah, and Steven to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

68. On October 29, 2026, the Times reported these findings in an article titled "NVIDIA Chief Seen as Target of Chinese Spy Plot." The article reported that the President had been briefed roughly a year earlier and had chosen not to act. It reported that U.S. officials had initially believed Mr. Huang did not know Ms. Huang was gathering information for China. But some senior administration officials doubted he could have stayed unaware. It also reported that investigators suspected some NVIDIA chips bought by Megaspeed were reaching China illegally.

69. NVIDIA again answered through its spokesman, who said Mr. Huang's interactions with Ms. Huang were "not unusual or unexpected." He added that meetings with customers are part of a CEO's job and that Mr. Huang meets thousands of customer executives each year.

70. That statement was misleading when made. Mr. Huang's relationship with Ms. Huang was intimate, not an ordinary customer contact. The Company's statement concealed that fact.

71. The same day, Senator Elizabeth Warren publicly called on Mr. Huang and NVIDIA's Board to give Congress answers about the reported intelligence findings. Until on or about November 9, 2026, the Board did not disclose open an investigation, correct the spokesman's statement, or question Mr. Huang.

**F. Mr. Huang Personally Vouches for the Relationship**

72. On October 30, 2026, Mr. Huang gave an interview to Bloomberg. He said NVIDIA's dealings with Megaspeed were "normal and not unusual." He said NVIDIA's relationship with Megaspeed's officials was proper and that the Company had confirmed Megaspeed had not sent its processors to China. He said NVIDIA had studied every Megaspeed deployment of its GPUs and "counted every one."

73. Mr. Huang also publicly said that Ms. Huang no longer worked at Megaspeed and that the U.S. government had never told him of its suspicions about her.

74. Mr. Huang knew when he made these statements that his relationship with Ms. Huang was intimate. Describing the Company's dealings with Megaspeed and its officials as normal concealed his personal conflict. That conflict bore directly on how much weight investors, regulators, and Congress could give the Company's account of its own compliance. Upon information and belief, no member of the Board took any step to correct or investigate these statements.

**G. Congress Demands Answers About NVIDIA's Safeguards**

75. On November 4, 2026, the chairs of three House committees wrote to Mr. Huang and NVIDIA. They were Representative Brian Mast of Foreign Affairs, Representative John Moolenaar of the Select Committee on the Chinese Communist Party, and Representative Rick Crawford of the Permanent Select Committee on Intelligence. They asked Mr. Huang to attend a joint closed-door briefing on November 18, 2026, or propose another date by November 11. The briefing would cover his interactions with Ms. Huang and NVIDIA's protocols for guarding against espionage by foreign adversaries.

76. This was not the first congressional request. In June 2026, Mr. Huang declined Senator Warren's invitation to testify before the Senate Banking Committee about NVIDIA's sales to China.

77. A congressional inquiry into the adequacy of the Company's own anti-espionage safeguards squarely called on the Board's oversight. Even so, the Board waited until its CEO

confessed before it acted.

**H. Mr. Huang Admits the Relationship; the Board Belatedly Reacts**

78. On Sunday, November 8, 2026, NVIDIA released a statement from its Board. It said the Board was "initiating an independent investigation" in light of reporting that Mr. Huang had been the target of a foreign intelligence effort. It said a committee of independent directors, assisted by outside counsel, would oversee the investigation. It also said the Board had "no reason to believe" that national security or NVIDIA's secrets had been compromised.

79. The Board acted only after Mr. Huang told it that he had been intimate with Ms. Huang. That same day, Mr. Huang sent a message to NVIDIA employees apologizing for being unfaithful to his wife and saying there was no excuse for what he had done.

80. The Board's statement prejudged the very question it said it would investigate. The Board announced its conclusion that nothing had been compromised before any investigator had been retained.

81. The Board also left Mr. Huang in command. A Company spokesman said Mr. Huang would not take part in choosing outside counsel but would continue to lead NVIDIA throughout the investigation.

82. On November 9, 2026, the President said publicly that the FBI was investigating Mr. Huang's relationship with Ms. Huang. He also said Mr. Huang had told him he had no idea she could be involved in espionage.

**I. Market Losses, Securities Action and Outside Counsel Investigation**

83. On November 9, 2026, NVIDIA's stock fell $7.97 per share, or about 4.3%, to close at $178.67. The decline erased roughly $190 billion in market value. The stock continued to fall before the market opened on November 10, 2026.

84. On November 9, 2026, a stockholder filed the Securities Action in the U.S. District Court for the Northern District of California against NVIDIA and Mr. Huang captioned *Kistenmacher v. NVIDIA Corp.*, No. 26-cv-13448 (N.D. Cal.).

85. The Kistenmacher class action asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 on behalf of purchasers of NVIDIA securities from October 9,

2025 through November 8, 2026. It alleges that the Company's statements about Megaspeed and about Mr. Huang's interactions with Ms. Huang were false or misleading because they concealed Mr. Huang's relationship with her.

86. NVIDIA now faces the cost of defending the Securities Action and potential liability in it. It also faces the cost of its internal investigation, of responding to congressional and law enforcement inquiries, and of any export-control enforcement relating to Megaspeed. It has suffered harm to its reputation with the U.S. government, on whose licenses and goodwill its international sales depend. These costs have already begin to mount with NVIDIA hiring the prestigious New York-based law firm Wachtell, Lipton, Rosen & Katz to conduct an inquiry stemming from the affair Huang has admitted to having with an alleged intelligence agent of the Chinese government. The Wachtell investigation will focus on determining whether Huang was the target of a foreign intelligence effort, as well as if NVIDIA's secrets or U.S. national security were compromised.

**J. A Board That Defers to Its CEO**

87. These failures reflect a long pattern. On November 10, 2026, the Times reported that the Board has a track record of loyalty and deference to Mr. Huang. Governance experts quoted in the article questioned whether the Board had been prepared to oversee the risk that Mr. Huang himself could become the Company's greatest vulnerability.

88. NVIDIA's directors have served a combined 161 years on its Board. The longest-tenured directors owe much of their extraordinary wealth to Mr. Huang's leadership:

a. Defendants Stevens and Coxe joined the Board after their venture firms, Sequoia Capital and Sutter Hill Ventures, led NVIDIA's $2 million funding round in 1993. They are NVIDIA's second- and third-largest individual stockholders after Mr. Huang. Mr. Stevens's stake was reportedly worth about $6.22 billion when he last sold shares in September 2026. Mr. Coxe's was reportedly worth about $5.62 billion when he last gave away shares.

b. Defendants Jones and Seawell, the former CEO and CFO of chip-design software supplier Synopsys, joined the Board in the 1990s. Their NVIDIA shares were reportedly worth a combined $1.86 billion as of June 2026.

89. NVIDIA has no evident CEO succession plan and no obvious internal successor, because Mr. Huang does not want a succession plan. Former NVIDIA executives have said that succession planning was discussed internally over the years but that Mr. Huang resisted it. One former executive, now the CEO of Arm Holdings, has said Mr. Huang disliked the idea because he believed it would cause divisive competition among executives. The Board has disloyally deferred to Mr. Huang.

90. According to three former employees, Mr. Huang has regarded the Board mainly as a governance requirement rather than an important part of the Company's strategy or execution. He has more than 60 direct reports and sits at the center of day-to-day operations.

91. Mr. Huang's son and daughter hold director-level roles at NVIDIA, and his son-in-law works in business development. Under Company policy, the NCGC reviews related-party transactions involving directors and executive officers. The 2026 proxy statement disclosed the children's employment and their fiscal 2026 pay of about $1.23 million and $1.32 million.

**K. Insider Trading Stock Sales While Red Flags Mounted**

92. While the Megaspeed red flags went unaddressed, and before the market learned of Mr. Huang's relationship, certain Defendants sold NVIDIA stock at prices that had not yet absorbed the November 2026 disclosures.

93. Defendant Stevens sold the most stock for the most value than any other insider throughout the Relevant Period. A summary of his sales reflect:

| Trade Date | Form 4 Filed | Shares Sold | Wtd. Avg. Price | Value of Sale | Shares Owned After | Holdings Sold |
|---|---|---|---|---|---|---|
| 12/5/2025 | 12/9/2025 | 350,000 | $181.73 | $63,604,065 | 34,663,754 | 1% |
| 12/19/2025 | 12/22/2025 | 222,500 | $180.17 | $40,087,380 | 34,182,604 | 1% |
| 3/20/2026 | 3/24/2026 | 221,682 | $173.68 | $38,502,524 | 33,960,922 | 1% |
| 6/2/2026* | 6/4/2026 | 1,000,000 | $221.10 | $221,102,600 | 32,653,422 | 3% |
| 6/18/2026 | 6/23/2026 | 885,000 | $210.17 | $185,999,938 | 31,768,422 | 3% |
| 8/31/2026* | 9/2/2026 | 1,848,501 | $222.26 | $410,843,671 | 29,921,132 | 6% |
| 9/3/2026* | 9/8/2026 | 1,022,239 | $230.51 | $235,636,867 | 28,898,893 | 3% |
| 9/18/2026 | 9/22/2026 | 1,366,000 | $219.73 | $300,147,095 | 27,532,89 | 5% |

| Trade Date | Form 4 Filed | Shares Sold | Wtd. Avg. Price | Value of Sale | Shares Owned After | Holdings Sold |
|---|---|---|---|---|---|---|
| | | | | | 3 | |
| **Total** | | **6,915,922** | | **$1,495,924,140** | | |

94. A summary of sales for other insiders reflects:

| Insider | Position | No. of Sales | Total Shares Sold | Total Value of Sales |
|---|---|---|---|---|
| Jen-Hsun (“Jensen”) Huang | President and Chief Executive Officer | 6 | 1,050,000 | $194,772,518 |
| Ajay K. Puri | EVP, Worldwide Field Operations | 4 | 1,000,000 | $183,002,963 |
| Colette M. Kress | EVP and Chief Financial Officer | 7 | 338,628 | $63,348,455 |
| Debora Shoquist | EVP, Operations | 2 | 309,840 | $56,186,172 |
| Harvey C. Jones | Director | 1 | 250,000 | $44,333,450 |
| Donald F. Robertson, Jr. | Principal Accounting Officer | 3 | 109,986 | $20,556,413 |
| Timothy S. Teter | EVP, General Counsel and Secretary | 2 | 60,460 | $13,323,048 |
| Aarti S. Shah | Director | 1 | 19,000 | $3,357,549 |
| Stephen C. Neal | Director | 1 | 15,500 | $3,343,863 |
| A. Brooke Seawell | Director | 1 | 12,728 | $2,341,117 |
| John Dabiri | Director | 3 | 4,255 | $801,507 |
| **Total** | | | **3170397** | **$585,367,055** |

## VI. DAMAGES TO NVIDIA

95. As a direct and proximate result of the Individual Defendants’ misconduct, NVIDIA has suffered and will continue to suffer substantial harm, including:

a. the costs of defending the Securities Action and any related actions, and any judgment or settlement in them;

b. the costs of the Board’s internal investigation, including fees of outside counsel, forensic consultants, and other advisors;

c. the costs of responding to inquiries from Congress, the FBI, the Department of Commerce, and any other government body, and any fines, penalties, or license restrictions that result;

d. harm to NVIDIA’s reputation and goodwill with U.S. and foreign governments, customers, and partners, including damage to the confidence in

its export compliance on which its licenses depend;

e. the loss of management focus, and the impairment of the Company's ability to deal with policymakers during a period of heightened scrutiny of its China-related business; and

f. compensation paid to Mr. Huang while he concealed a conflict that put the Company at risk, which he did not earn in good faith.

96. NVIDIA has also been left without a CEO succession plan. That leaves the Company exposed to the risk of an abrupt leadership disruption caused by the very misconduct alleged here.

## VII. DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

### A. Derivative Standing

97. Plaintiff brings this action derivatively, for NVIDIA's benefit, to redress injuries the Company suffered because of the Individual Defendants' breaches of fiduciary duty. NVIDIA is named only as a nominal defendant.

98. Plaintiff has owned NVIDIA stock continuously since before the wrongdoing alleged here began, holds it now, and will hold it through the end of this action. Plaintiff will fairly and adequately represent NVIDIA's interests and has retained counsel experienced in stockholder derivative litigation.

99. Plaintiff has not made a pre-suit demand on the Board. Demand is excused because it would be futile, for the reasons set out below.

100. The Board has eleven members: Huang, Coxe, Dabiri, Hudson, Jones, Lora, Neal, Nora Johnson, Seawell, Shah, and Stevens. Demand is excused if at least six of them could not impartially consider a demand. As shown below, at least nine could not.

### B. Mr. Huang Cannot Consider a Demand

101. Mr. Huang is the central wrongdoer. He concealed a conflict of interest that violated the Code of Conduct. He made misleading public statements about NVIDIA's dealings with Megaspeed and its officials. He is the subject of the Board's investigation and, according to the President, of an FBI inquiry. He is a named defendant in the Securities Action. He faces a substantial likelihood of liability on Counts I, III, and IV.

102. Mr. Huang is also not independent. NVIDIA's 2026 proxy statement concedes as much. His compensation, his roughly 3.58% stake, and his position all depend on remaining CEO, and his children are employed by the Company.

**C. A Majority of the Board Faces a Substantial Likelihood of Oversight Liability**

103. Every Outside Director Defendant except Ms. Nora Johnson served on the Board throughout the period from October 2025 to November 2026. Ms. Nora Johnson joined in July 2026 and served during the critical weeks after the October 29, 2026 report. Each director was presented with the following red flags, which grew more serious over time:

a. the October 9, 2025 Times report that Commerce was actively investigating Megaspeed, a roughly $2 billion customer, for helping China evade export controls, and that Singapore police were also investigating it;

b. the Company's own prior engagement with the U.S. government about Megaspeed, which management disclosed publicly in October 2025;

c. public reporting and photographs showing that Megaspeed's senior executive had personal access to NVIDIA's CEO;

d. the October 29, 2026 Times report that U.S. intelligence had identified that executive as a Chinese intelligence asset with a close relationship to Mr. Huang;

e. Senator Warren's October 29, 2026 call for the Board itself to answer Congress; and

f. the November 4, 2026 letter from three House committee chairs demanding a briefing on Mr. Huang's contacts and the Company's anti-espionage protocols.

104. Each red flag concerned a mission-critical compliance risk: diversion of export-controlled chips and foreign intelligence penetration of the Company's leadership. Each pointed directly at the CEO. And each would have prompted any director acting in good faith to ask the what is the nature of Mr. Huang's relationship with Ms. Huang.

105. The Board never asked, or if it asked, it accepted no answer, took no action and made

no disclosure. For thirteen months after the October 2025 report, and for ten days after the October 2026 intelligence report, the Board opened no investigation and imposed no restrictions. It did not correct the Company's public statements. It acted only after Mr. Huang volunteered his admission on November 8, 2026. That is a conscious failure to respond to known red flags.

106. In the alternative, the Board failed to implement any reporting system reasonably designed to bring to its attention a senior executive's personal relationships with customers under export-control investigation, or approaches to Company leaders by persons suspected of acting for foreign intelligence services. NVIDIA's disclosures describe no such system, even though the Company sells the most strategically sensitive commercial technology in the world.

107. NCGC members (Neal, Dabiri, Jones, Lora, and Stevens). The NCGC is expressly charged with overseeing trade compliance, governmental relations, and non-financial regulatory matters, and with screening transactions involving executive officers for conflicts. Export-control compliance at Megaspeed, the CEO's conflict with a Megaspeed executive, and the Company's relationship with Congress all fell squarely within the NCGC's charge. Its five members face a heightened likelihood of liability. Mr. Neal faces additional exposure as NCGC chair and Lead Director, the independent director responsible for leading the Board in the absence of a chair.

108. Audit Committee members (Seawell, Coxe, Jones, Lora, Nora Johnson, and Shah). The Audit Committee oversees regulatory risks and the accuracy of the Company's public disclosures. It failed to act on red flags indicating that the Company's statements about Megaspeed and about the CEO's dealings with Ms. Huang were incomplete.

109. Defendants Coxe, Dabiri, Hudson, Jones, Lora, Neal, Seawell, Shah, and Stevens therefore each face a substantial likelihood of liability on Count II. That alone is nine of eleven directors.

**D. The Board's Conduct Since November 8 Confirms It Cannot Act Impartially**

110. On the day it announced its investigation, the Board publicly declared that it had "no reason to believe" national security or NVIDIA's secrets were compromised. A board that announces its exculpatory conclusion before an investigation begins has not approached the question with an open mind and therefore cannot objectively consider a demand.

111. The Board has also abdicated its role to Mr. Huang in full control of the Company, including over the employees and records the investigation must examine. It has not disclosed who sits on the investigating committee. And every potential member of that committee is a director whose own oversight failures are at issue.

**E. A Majority of Directors Lack Independence from Mr. Huang**

112. Defendants Stevens and Coxe. Each joined the Board after his venture firm funded NVIDIA in 1993 and has spent more than three decades alongside Mr. Huang. Each has become a billionaire through the Company Mr. Huang built and runs, holding NVIDIA stakes reportedly worth more than $5 billion apiece. Relationships of this length, intensity, and financial consequence go well beyond ordinary board service. They give each director a personal stake in Mr. Huang's continued leadership.

113. Defendants Jones and Seawell. Each has served with Mr. Huang since the 1990s, since 1993 for Mr. Jones and 1997 for Mr. Seawell. Their NVIDIA holdings are reportedly worth a combined $1.86 billion. The same reasoning applies.

114. Defendant Shah. Ms. Shah's son is employed by NVIDIA, a company whose management Mr. Huang controls with more than 60 direct reports. NVIDIA's 2026 proxy disclosed his fiscal 2026 compensation of about $265,000. Ms. Shah cannot be expected to vote to sue the CEO who leads the organization employing her son.

**F. The 2026 Proxy Evidences Futility**

115. Defendants Huang, Coxe, Dabiri, Hudson, Jones, Lora, Neal, Seawell, Shah, and Steven have a documented history of deferring to Mr. Huang in the 2026 Proxy. They did so when they recommended against a shareholder proposal to replace the supermajority voting provisions in the Charter and Bylaws with a simple majority standard.

116. In support of replacing the supermajority voting provisions in the Charter and Bylaws with a simple majority standard, the stockholder advocating for the proposal stated in part:

> Shareholders are willing to pay a premium for shares of companies that have excellent corporate governance. The supermajority voting requirements, like those of NVIDIA Corporation (NVDA), have been found to be one of 6 entrenching mechanisms that are negatively related to company performance according to "What Matters in Corporate Governance" by Lucien Bebchuk, Alma Cohen and Allen Ferrell of the Harvard Law School. Supermajority requirements can be used to block

proposals supported by most shareowners but opposed by management.

117. Despite this study and enhancement advocated for in the Harvard Law School article, Defendants Huang, Coxe, Dabiri, Hudson, Jones, Lora, Neal, Seawell, Shah, and Steven recommended against this proposal because "the Board would need to resubmit a proposal substantially similar to the 2025 A&R Charter Proposal for stockholder approval at a future annual meeting. At this time, the Board believes that addressing repetitive proposals on this topic would not be an effective use of time, resources, and attention." This blatant disregard of defendants Huang, Coxe, Dabiri, Hudson, Jones, Lora, Neal, Seawell, Shah, and Steven to consider updating NVIDIA's corporate governance only served to entrench Huang at the risk of negative company performance.

**G. Insider Trading Defendants**

118. Defendants Stevens, Neal, Dabiri, Shah, Jones, Seawell and Huang breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock price was artificially inflated as a result of the Individual Defendants' false and misleading statements discussed herein, netting combined total proceeds of approximately $2,000,000,000. No disclosure or announcement has been made to request the investigation from outside counsel includes their insider trading. Each face a substantial likelihood of liability under *Brophy* for insider trading. If any one of the selling directors were to pursue breach of fiduciary duty or insider trading claims against one another, it would only open the door to breach of fiduciary duty and insider trading claims against themselves. This could collectively cost them approximately $2,000,000,000. Therefore, any demand upon a board with a majority of directors who engaged in insider trading this Board is futile.

119. The Board as a whole has allowed Huang to block CEO succession planning. According to former employees, he treats the Board as a formality. A board that has never been willing to plan for Mr. Huang's departure cannot be expected to authorize litigation against him. The board as a whole also violated the Code of Conduct. It did so by conducting little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to make and/or cause the Company to make materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the

Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

## VIII. CAUSES OF ACTION

### COUNT I – Against Huang, Coxe, Dabiri, Hudson, Jones, Lora, Neal, Seawell, Shah, and Stevens for Violations of Section 14(a) of the Exchange Act

120. Plaintiff incorporates the preceding paragraphs by reference.

121. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

122. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

123. Defendants Huang, Coxe, Dabiri, Hudson, Jones, Lora, Neal, Seawell, Shah, and Stevens caused the 2026 Proxy Statement to be false and misleading by failing to disclose, inter alia, that: China may have been buying the banned NVIDIA chip, China drove a significant portion of 2026 compute revenues, that Commerce officials were actively investigating whether Megaspeed was helping Chinese companies evade U.S. export restrictions, that Mr. Huang was involved in a romantic or personal relationship with Ms. Huang. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or

lacked a reasonable basis at all relevant times.

124. Under the direction and watch of Defendants Huang, Coxe, Dabiri, Hudson, Jones, Lora, Neal, Seawell, Shah, and Steven, the 2026 Proxy Statement also failed to disclose, inter alia, that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2026 Proxy Statement's description of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

125. In the exercise of reasonable care, Defendants Huang, Coxe, Dabiri, Hudson, Jones, Lora, Neal, Seawell, Shah, and Steven should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2026 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2026 Proxy Statement, including, but not limited to, the reelection of the Company's directors.

126. As a result of Defendants that China may have been buying the banned NVIDIA chip, that Commerce officials were actively investigating whether Megaspeed was helping Chinese companies evade U.S. export restrictions, that Mr. Huang was involved in a romantic or personal relationship with Ms. Huang causing the 2026 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: re-elect Defendants Huang, Coxe, Dabiri, Hudson, Jones, Lora, Neal, Seawell, Shah, and Steven to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

127. The Company was damaged as a result of Defendants Huang, Coxe, Dabiri, Hudson, Jones, Lora, Neal, Seawell, Shah, and Steven material misrepresentations and omissions in the 2026 Proxy Statement.

128. Plaintiff, on behalf of NVIDIA, has no adequate remedy at law.

**COUNT II — Breach of Fiduciary Duty Against All Defendants**

129. Plaintiff incorporates the preceding paragraphs by reference.

130. As a director and as CEO, Mr. Huang owed NVIDIA duties of loyalty and good faith. Those duties include a duty to disclose to the Board material conflicts of interest, and a duty as an officer to report to the Board red-flag information within his area of responsibility.

131. Huang breached those duties by (a) carrying on an undisclosed intimate relationship with a senior executive of a significant customer that he knew was under U.S. and foreign investigation for diverting NVIDIA's products to China; (b) concealing that relationship from the Board, in violation of the Code of Conduct, while the Board and the Company were publicly vouching for the ordinary nature of his contacts; (c) placing his personal interests ahead of the Company's export-control compliance and its protection against foreign intelligence threats; and (d) failing to inform the Board of the relationship after the October 2025 and October 2026 reports made its significance unmistakable.

132. Mr. Huang acted in bad faith and for personal reasons unrelated to the Company's interests. His conduct is not protected by the business judgment rule or exculpable under 8 Del. C. § 102(b)(7).

133. The Outside Director Defendants owed NVIDIA a duty to make a good-faith effort to oversee the Company's mission-critical compliance risks. Those risks include export-control compliance and protection against foreign intelligence threats.

134. The Outside Director Defendants breached that duty in bad faith by consciously disregarding the red flags described herein. They failed to investigate the CEO's relationship with an executive of a customer under federal export-control investigation. They allowed the Company to keep issuing assurances about that relationship and about Megaspeed. They did not act until Mr. Huang confessed. In the alternative, they utterly failed to implement any reporting system reasonably designed to surface those risks.

135. Because these breaches involve bad faith and the duty of loyalty, they are not exculpable.

136. As a direct and proximate result, NVIDIA has been damaged.

**COUNT III — Breach of Fiduciary Duty Against Defendant Huang**

137. Plaintiff incorporates the preceding paragraphs by reference.

138. A fiduciary who knowingly disseminates false or misleading information about the corporation breaches the duty of loyalty.

139. Mr. Huang knowingly made, or caused or allowed the Company to make, the misleading statements described herein. Each portrayed his dealings with Ms. Huang and NVIDIA's dealings with Megaspeed as normal while concealing his intimate relationship with her.

140. Those statements exposed NVIDIA to the Securities Action, to government scrutiny, and to reputational harm. NVIDIA has been damaged.

**COUNT IV — Unjust Enrichment against Defendant Huang for 2026 Compensation**

141. Plaintiff incorporates the preceding paragraphs by reference.

142. Mr. Huang received salary, cash incentive payments, and equity awards from NVIDIA, including $36,343,830 in total compensation for fiscal 2026, during the period in which he concealed his conflict and breached his fiduciary duties.

143. It would be unjust for Mr. Huang to keep compensation paid on the assumption that he was faithfully serving the Company. Equity and good conscience require that he disgorge it, or the portion the Court finds unearned, to NVIDIA.

144. Plaintiff, on NVIDIA's behalf, has no adequate remedy at law.

**COUNT V — Unjust Enrichment against Defendants Stevens, Neal, Dabiri, Shah, Jones, Seawell, Huang, Puri, Kress, Shoquist, Robertson, and Teter for Insider Stock Selling Profits and Disgorgement**

145. Plaintiff incorporates the preceding paragraphs by reference.

146. In further breach of their fiduciary duties, during the Relevant Period, while shares of the Company's common stock were at artificially inflated prices before the fraud was exposed, five of the Defendants Stevens, Neal, Dabiri, Shah, Jones, Seawell, Huang, Puri, Kress, Shoquist, Robertson, and Teter engaged in lucrative insider sales, netting combined total proceeds of approximately $2 billion.

147. These Defendants had actual or constructive knowledge that they had caused the Company to improperly issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. These Defendants had actual knowledge of

the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of NVIDIA securities.

148. These Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of NVIDIA's securities and disguising insider sales. These Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

149. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

150. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, NVIDIA has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

151. Plaintiff on behalf of NVIDIA, has no adequate remedy at law.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of NVIDIA, respectfully requests that the Court enter judgment:

A. Declaring that Plaintiff may maintain this action on behalf of NVIDIA, and that Plaintiff is an adequate representative of the Company;

B. Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to NVIDIA;

C. Determining and awarding to NVIDIA the damages sustained by it as a result of the

violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

D. Directing NVIDIA and the Individual Defendants to take all necessary actions to reform and improve NVIDIA's corporate governance and internal procedures to comply with applicable laws and to protect NVIDIA and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;
2. a provision to permit the shareholders of NVIDIA to nominate at least four candidates for election to the Board;
3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

E. Awarding NVIDIA restitution from Individual Defendants, and each of them;

F. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G. Granting such other and further relief as the Court may deem just and proper.

Dated: November 11, 2026

**THE DIULIO FIRM PC**

/s/ Kristopher P. Diulio____________
Kristopher P. Diulio

Attorneys for Plaintiff
FLOR ANGELA VANEGAS

**PLAINTIFF'S DEMAND FOR A JURY TRIAL**

Plaintiff FLOR ANGELA VANEGAS demands a trial by jury on all causes of action triable to a jury.

Dated: November 11, 2026

**THE DIULIO FIRM PC**

**/s/** Kristopher P. Diulio
Kristopher P. Diulio

Attorneys for Plaintiff
FLOR ANGELA VANEGAS

# VERIFICATION OF FLOR ANGELA VANEGAS

I, FLOR ANGELA VANEGAS, am a plaintiff in this action. I have reviewed the allegations made in the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Nov 11, 2026

Catalina Ricaurte Vanegas (Nov 11, 2026 15:47:06 EST)

FLOR ANGELA VANEGAS